[Civ. No. 28716.   Second Dist., Div. Two.   Jan. 10, 1966.]

JOSEPH K. BORGES, Plaintiff and Appellant, v. HOME INSURANCE COMPANY et al., Defendants and Respondents.

Joseph K. Borges, in pro. per., for Plaintiff and Appellant.

Lillick, Geary, McHose & Roethke, Lawrence D. Bradley, Jr., and Thomas H. Werdel, Jr., for Defendants and Respondents.

ROTH, P. J.—This is an appeal from a summary judgment entered pursuant to respondents' motion therefor. The amended complaint is for damages inducing breach of contract. Depositions were taken and thereafter each side made a motion for summary judgment supported by affidavits, points

and authorities and the record. Appellant's motion was denied. Respondents' motion was granted.

Although there are some statements made by respective counsel which tend to indicate that the adversary litigants, when their respective motions came on for hearing, may have intended that the hearing of the contesting motions be considered as a submission of the case on its merits, there is no stipulation to that effect, nor are there specific statements by counsel which would warrant this court in holding there was such a submission, especially, since the trial court rendered a summary judgment which specifically recited there was no triable issue.

We have been cited to no case and know of none which permits a reviewing court to treat two contesting motions for a summary judgment as a submission of the case to the court for a judgment on the record. We therefore test the validity of this judgment by the well-settled rules which rigidly restrict the granting of a motion for summary judgment.

Appellant's "opposition to [respondent's] motion . . ." and the documents filed in support of his motion for summary judgment, leave much to be desired. However, appellant did in said document include an affidavit consisting of excerpts from the deposition of Norman A. Benfer, superintendent of the loss and claim department of Home Insurance Company (Home). This affidavit was not part of the record on appeal.

We have augmented the record on our own motion to include appellant's affidavit.

The record is such as permits different inferences to be drawn from the facts, even though we agree that there are no controverted material facts.

■ It is trite to say that despite the insufficiency of the affidavits filed in opposition to a motion for summary judgment, the moving party must show by his own motion that no triable issue of fact exists. (*Wilson* v. *Bittick,* 63 Cal.2d 30, 34 [45 Cal.Rptr. 31, 403 P.2d 159] ; *Towne Development Co.* v. *Lee,* 63 Cal.2d 147, 148 [45 Cal.Rptr. 316, 403 P.2d 724] ; *de Echeguren* v. *de Echeguren,* 210 Cal.App.2d 141, 147 [26 Cal.Rptr. 562].)

In *Bittick, supra.* the court says at pages 34-35 : " '. . . In examining the sufficiency of affidavits . . . the affidavits of the moving party are strictly construed and those of his oppo-

nent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. Such summary procedure is drastic and should be used with caution so that it does not become a substitute for the open trial method of determining facts.' [Citations.]''

On September 17, 1961, a boat owned by Harriet Burbank and her husband Eugene,[1] insured in the sum of $20,000 by respondent Home, naming Harriet as the sole insured, was destroyed by fire.

On September 18, 1961, Harriet, by written contract,[2] retained Joseph K. Borges as her attorney (Borges) to collect the insurance. The retainer, made a part of the amended complaint, among other things, provided $33\frac{1}{3}$ percent to Borges if the claim was settled without suit and ''The Attorney is hereby given a lien for his fees . . . upon any settlement or judgment made or secured herein.'' It also provided ''No dismissal or settlement will be made without the consent of both parties. . . .''

Home tentatively raised arson as the cause, but after investigation, dropped the charge. Sometime between January 3 and January 31, 1962, Home notified Burbanks it would pay in full.

It is undisputed that Home during the progress of appellant's negotiations with Home which commenced a day or two after the fire, and the consummation thereof knew that appellant was the attorney for Harriet. However, the record shows no direct notice to Home of his written contract with the Burbanks or of any equitable lien Borges may have had on the insurance proceeds as provided for in the contract. In a deposition Borges testified: ''Q. Did you ever make known to either Mr. Benfer or . . . Home . . . that you had a lien on the settlement funds? A. Not in those words, no. . . .''

---

[1] A letter dated October 2, 1961, by the attorney for the Burbanks refers to the damages of the boat of Eugene Richard Burbank, but the record appears to indicate that the boat was registered to Harriet and the insurance proceeds were payable to Harriet.

[2] The contract was made between Harriet as client and Joseph K. Borges, but it was also signed by Gene Burbank. As pointed out *infra*, insurance proceeds were payable and were actually paid to Harriet. Two of the checks issued by Home did not include the name of Gene or Eugene Burbank. The true ownership of the insurance proceeds could be of importance to determine the validity of the U.S. Government lien discussed *infra*, which did include the names of Eugene and Harriet Burbank, and the government.

It is undisputed that Borges, promptly after being retained, contacted one Captain Richard L. Wakeland,[3] and in an exchange of correspondence during the month of October 1961, forwarded to Wakeland a signed statement from Eugene ". . . concerning the loss and damage to his boat. . . ."

On January 3, 1962, Borges, so far as the record shows, had his first written contact with Home. On that day he wrote "Attention: Norm Benfer"[4] in part, "I have been retained by Eugene and Harriet Burbank. . . .

"Capt. . . . Wakeland, . . . has informed me he sent his report . . . to your office . . . sometime ago. I have not received any reply. . . . I would like to know the status of this matter.

". . . please . . . have one of your adjusters contact me. . . ."

On January 31, Borges wrote, attention Benfer: "This letter is to confirm . . . your company is going to honor the claim of Harriet Burbank. . . .

"Kindly make . . . check payable to Harriet Burbank and Joseph K. Borges, her attorney.

"We are contacting . . . Wakeland to ascertain salvage value of the hulk [sic]."

On February 8, 1962, Benfer forwarded to Borges the proof of claim which Borges in turn transmitted to Harriet on February 19, 1962.

Without the knowledge of Borges, Harriet, having lost the proof of claim forwarded to her by Borges (at least so it appears from the record) did on March 2, 1962, go to the office of Benfer, accompanied by her husband but without Borges. She executed a new proof of loss, in the presence of Benfer. Benfer, in his affidavit says Harriet ". . . admitted to him that she owed Thico, . . . $299.60, and Bank of America . . . $12,719.04. . . ." Benfer does not say nor does it appear anywhere in the record whether this conversation was by telephone or in his office. Benfer does say in his affidavit ". . . [O]n March 5, 1962, with Harriet Bur-

---

[3]It seems clear from the record that Wakeland was an investigator for Home and was not independently employed by Borges. The actual status of Wakeland may be of some importance to help determine the beginning and the extent of Home's knowledge of Borges' representation of Burbanks.

[4]The attention salutation to Benfer indicates previous contact between Benfer and Borges.

bank's . . . permission, he authorized the following three drafts to be issued . . . :

(1) To the United States Treasury Department, Harriet Burbank and Eugene Burbank, in the amount of $6,981.36; [hereafter referred to as tax check].

(2) To Harriet Burbank and Bank of America . . . in the amount of $12,719.04; and,

(3) To Thico in the amount of $299.60.''

Benfer does not say whether this conversation on March 5 was by telephone or in his office. It is clear, too, that Borges was not privy to either conference or conversation, and that there was a new proof of loss filled out and signed by the Burbanks without the knowledge of Borges, and that this new proof of loss was completed and signed in Benfer's presence, either on March 2, 1962, or on March 5, 1962.

The record in fact shows that Borges, unaware of what had already taken place on or prior to March 5, did on March 5 address a letter to Home, Attention: Benfer, which said, in part:

''I've been waiting for my client to send the proof of loss . . . she lost the proof of loss . . . and has signed another one with your office directly. I don't know in whose presence she signed this or when. I hope you have this information.

''I am writing . . . concerning a purported government tax lien. . . . [S]end me any information you have regarding government tax liens, amounts, dates, parties, etc. Someone from your office was going to send me photostats previously. These I have not received.

''This letter is also to advise you not to include the government's name on the check until we ascertain whether Harriet Burbank is liable on the tax liens; . . . .''

The tax liens had been asserted at an earlier date, late in December 1961 or early in January 1962, and Borges had made it known that there was considerable question in his mind whether Harriet was liable for any but a fraction of the asserted liens.

The tax check was delivered by Benfer to Mr. Pincus, a federal revenue agent, on March 7, 1962. It is shown by Benfer's deposition that the Borges letter of March 5th was received by Home prior to the delivery of any of the three checks to anyone. Benfer testified: ''Q. The checks were still

in your possession at the time you received this letter; is that correct? A. . . . [Y]es.''

Sometime between March 5 and March 12, 1962, Borges learned about the meeting between the Burbanks and Benfer, specifically when, is not disclosed by the record. In a telephone call made by Borges to Benfer between those dates, Benfer was reminded by Borges that he, Borges, represented the Burbanks. This knowledge Benfer has at no time denied. Presumably in his conversation with Benfer on a date between March 5 and March 12, Borges learned that Home had drawn the tax check omitting the name of Borges. Borges orally requested that payment be stopped on the tax check. Benfer said he would try, if Borges obtained written authorization from the Burbanks. It is not clear from the record whether this conversation was on a day prior to March 7 or on March 7, prior to the delivery of the tax check. Since it is uncontradicted that Benfer did state to Borges that he would try to stop payment if authorized in writing by the Burbanks, it is fair to assume he was in a position to do so.

Benfer also made known to Borges that two checks, one to Harriet and Thico and a second to Harriet and Bank of America, had been drawn. These two checks sometime prior to March 12, probably as a result of the above conversation between Borges and Benfer, were delivered to Borges. Neither check included the name of Borges. Borges, on receipt of the two checks, again called Benfer, and pursuant to his request, he was authorized by Benfer to add his name as payee on each.

It also appears that prior to March 12, Borges had a meeting with the Burbanks in which he castigated them for their conduct. Why, does not appear, but as a consequence of this meeting, Borges endorsed both checks on which he had been authorized to include his name as payee and they were in turn delivered respectively to Thico and Bank of America.[5]

---

[5]It is inferable that in his conference with the Burbanks, Borges was persuaded to endorse the checks to Thico and the Bank of America, in consideration of the Burbanks' signature, authorizing a stop payment on the tax check. If this is so, it is clear that Borges was clearly under the impression that all he needed to effectively stop payment on the tax check, was the signatures of the Burbanks. Whether he was justified in this belief by the conduct of Home, is a question of fact.

Moreover, even if Borges was justified in relying on Benfer's statement, it cannot be determined from the record whether Borges had rights superior to those of Bank of America and Thico in the checks endorsed over to the latter, and thus whether Borges suffered economic detriment sufficient to create a cause of action for promissory estoppel (see Rest., Contracts, § 90.)

On March 12, pursuant to Benfer's request in respect of stopping payment on the tax check, Borges wrote to Home, attention Benfer, in substance as follows:

"This . . . is to authorize you to stop payment on that certain check in the sum of $6,981.36 . . . issued . . . in favor of the United States Treasury Department . . . and issue another one in its place to . . . : United States Treasury . . . and Harriet Burbank and Joseph K. Borges, her attorney. . . ."

The letter was approved and signed by each Burbank.

The foregoing recital outlines in substance the facts which are uncontradicted although there is uncertainty as to time elements in respect of some.

The affidavits of the parties in support of their respective motions shed some light on these uncertainties and add facets, indicating differences. Benfer's affidavit shows that Borges' letter of March 5 was received by respondent's office on March 7, 1962, prior to the delivery of the tax check to Mr. Pincus of the Internal Revenue Service.[6]

Mr. Benfer admits he had been requested by appellant prior to the time any of the three checks were drawn, to include appellant's name on the checks, and had intended to do so as a courtesy[7] to appellant, but forgot to write appellant's name on the tax check, or either of the other two checks. He argues he had no legal obligation to include the name of Borges. Mr. Benfer also admitted that when an attorney represents a claim against Home, he invariably deals with the attorney.

Home did not attempt to and did not stop payment on the tax check. It was cashed.

Finally, Mr. Benfer says in his affidavit: "21. That neither he nor Home were advised by plaintiff that plaintiff had a contractual lien against the settlement funds until after the aforesaid drafts were cashed.

"22. That plaintiff never asserted to Home or him that plaintiff had any interest of any kind in the settlement funds other than as attorney for the claimant until after the aforesaid drafts were cashed.

---

[6]There is an indication from which an inference can be drawn when Benfer was orally requested to stop payment of the tax check by Borges, he discussed this subject with Pincus.

[7]Benfer averred that they always dealt with a known attorney as a matter of courtesy.

"23. That he never instructed, advised or indicated in any way to Harriet Burbank or Eugene Burbank that they need not retain plaintiff as their attorney to settle their claim.

"24. That neither he nor Home had any knowledge of the terms of plaintiff's retainer agreement with Harriet and Eugene Burbank until after the aforesaid drafts were cashed.

"25. That neither he nor Home ever intended to interfere with or obstruct in any manner plaintiff's retainer agreement with Harriet and Eugene Burbank."

■ Although Home is not chargeable with knowledge of an equitable lien, the record does show Home's knowledge of Borges' representation from the beginning; its continued dealing with Borges in forwarding proof of loss; exchanging of letters; the two conferences with the Burbanks without the knowledge or presence of Borges; the issuance of three checks as a consequence of said two conferences, omitting the name of Borges, contrary to his explicit instructions to include his name; authorizing Borges to add his name to two checks after it had been omitted; discussions re stop payment on the tax check; the admission of Benfer that he customarily dealt with the attorney of the assured when he knew there was an attorney, albeit as a courtesy;[8] raise questions as to whether there is evidence of a triable issue of intentional interference with a contract which on a motion for summary judgment cannot be eliminated merely by Benfer's explanation "I just forgot."[9]

There can be no question from the record that Home knew that Borges was retained and that there was a contractual relation between Borges and the Burbanks, even though the record does not show that Home knew Borges had an equitable lien on the insurance proceeds.

If this were a judgment on the merits, there would, of course, be no question that the court accepted the evidence of innocent forgetfulness and a finding to that effect, express or

---

[8]Whether such dealing was in fact a courtesy or a binding custom, is a subject of evidence.

[9]Benfer, in his deposition, testified: "Q. Is there any reason why you did not include my name . . . ? That is the crux of the whole thing. A. Yes, I know. I just forgot. . . . Q. The mistake that you made is not putting my name on the draft. A. Normally would have, and this particular— Q. Case, you didn't? A. . . . [I]t just went by the boards. Q. You remember, . . . you said, I made a 'boo-boo?' A. I don't know if I used those words. Q. You sure made a boo-boo on that one— A. I could have said a 'goof.' "

implicit, would settle that issue. However, in reviewing a summary judgment, when an inference to the contrary can logically be made, we must make it.

In this connection we are sensitive to the fact that Home had no pecuniary reason for interfering with Borges' contract. It paid the full amount of the claim. However, it may be that Benfer resented Borges. The record shows that Home at the outset raised the issue of arson. Borges was retained as early as October 1961 and immediately contacted Wakeland who appears to be an adjuster or investigator for Home. Whether the charge was dropped because of Borges or in spite of Borges is not apparent from the record. We certainly do not suggest either, nor do we suggest that the inference is one that should be drawn by the trier of fact.

Further, whether Home had notice of sufficient scope in time and was properly authorized orally and/or in writing to stop payment on the tax check, before it was finally cashed, are issues of fact which must be determined before it can be concluded that Home had no legal obligation to stop payment on the tax check. It is admitted by the record that Borges made it clear to Home before the tax check was delivered that there was a question of Harriet's liability on the lien levied by the Government;[10] that the lien as levied was primarily against Eugene Burbank; that Benfer said to Borges he would try to stop payment and his request to Borges for written authorization for the Burbanks so to do.

---

[10]Photostats of notices of lien filed with the county clerk had been transmitted to Home. The notices showed 1) Against Eugene Burbank filed January 4, 1962, in the amount of $6,231.24; 2) Against Eugene Burbank filed February 13, 1962, in the amount of $298.15; 3) Against Harriet Burbank, filed February 13, 1962, in the amount of $299.19. The levy on Home was against Eugene and/or Harriet Burbank.

26 U.S.C.A. § 6331 permits levy upon ''. . . all property and rights to property . . . belonging to such person . . .'' Section 6332 of the same code provides: ''(a) Any person *in possession of (or obligated with respect to)* property or rights to property *subject to levy* upon which a levy has been made shall, upon demand of the Secretary or his delegate, surrender such property or rights. . . .'' (Italics added.) Subsection (b) then prescribes a penalty for failure to surrender the property including full liability for the value of the property.

*Cannon* v. *Nicholas,* 80 F.2d 934, a case involving insurance proceeds holds at p. 936: ''[A] wife's property cannot be taken for . . . husband's taxes.'' *Cannon* seems to indicate that when facts are such that a wife's separate property may be involved, there is no obligation to blindly pay a tax lien of the husband. *Commonwealth Bank* v. *United States,* 115 F.2d 327 squints to the contrary. We do not decide that the insurance proceeds here involved were Harriet's separate property. We suggest only that an issue of fact and law is created by the undisputed evidence.

It can be logically inferred that Borges endorsed the two checks on which Home authorized him to include his name because he relied on Benfer's statement to try and stop payment on the tax check, if written authorization were obtained from the Burbanks. Such reliance may create a promissory estoppel. We are mindful too that if Borges is correct in his assertion made to Home that Harriet owed only a small fraction of the tax lien, that Harriet still has a cause of action for a refund. Such right to a refund, however, does not relieve Home from liability arising from its promise to try and stop payment on the tax check, if the evidence warrants a finding by the trier of fact that the conditions to the promise of Home to try and stop payment were timely met by Borges and its failure to do so resulted in damages to Borges.

Finally, the fact that Borges endorsed the two checks on which he had been authorized to write his name, may, depending on the evidence ultimately adduced, constitute a waiver by Borges of any claim he may have against Home.

Enough has been pointed out to indicate that even on the admitted evidence there is enough to indicate different probabilities as to what the ultimate facts are depending upon what inferences are drawn. This evidence must be resolved by the trier of fact, in a trial on the merits, before this court can determine what issues of law are involved.

The judgment is reversed.

Herndon, J., concurred.

FLEMING, J., Concurring.—It appears to me Home owed no duty to Borges to recognize any lien for attorney's fees until such time as he advised Home that he had a contractual lien. At no time did he do this. Consequently, Home had neither responsibility nor authority to pay out the insured's moneys to Borges or anyone else, except as instructed by the insured, Harriet Burbank. (*Ambrose* v. *McDonald,* 53 Cal. 28.)

On March 5 Home issued three drafts in accordance with instructions from Harriet Burbank, the insured. It still had no legal duty or authority to stop payment on these drafts on instructions of Borges. Instructions only came with Harriet Burbank's letter, dated March 12, which gave authority to stop payment on the United States Treasury Department draft and issue a new one with different payees. If her

instructions were delivered to Home before March 16, the date on which the Treasury Department draft was presented for payment, a question of law and fact might possibly arise as to whether Home had breached any duty owed to Harriet Burbank of which Borges was a beneficiary. The record strongly suggests that Borges did not deliver the stop-payment authorization to Home before March 16, but there is some room for doubt.

Other than this limited point I see no contested issue of fact here the resolution of which would affect the legal rights of the parties or support any liability on the part of Home to pay twice on the same insurance policy.

A petition for a rehearing was denied February 9, 1966. Fleming, J., was of the opinion that the petition should be granted.