Filed 1/31/23  Rabo AgriFinance v. Valadao CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| RABO AGRIFINANCE, LLC, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> EDUARDO VALADAO, <br><br> Defendant and Appellant. | B322658 <br><br> Fresno County <br> Super. Ct. No. 17CECG03829 |

APPEAL from judgment of the Superior Court of Fresno County.  Kimberly A. Gaab, Judge.  Reversed and remanded.

Griswold, LaSalle, Cobb, Dowd & Gin, Jeffrey L. Levinson; McCormick, Barstow, Sheppard, Wayte & Carruth and Scott M. Reddie for Defendant and Appellant.

Baker Manock & Jensen, J. Jackson Waste, Joseph M. Marchini and Michael J. Fletcher for Plaintiff and Respondent.

_____

This is an appeal from judgment following summary adjudication in favor of plaintiff and respondent Rabo AgriFinance, LLC (Lender), as successor in interest to Rabobank, N.A. Lender lent money to Edward Valadao, Jr. and April Valadao (together, the Valadaos[1]), spouses who did business under the name "Lone Star Dairy." Lender also lent money to Triple V Dairy, a partnership in which the Valadaos were, along with others, general partners.

Defendant is the father of Edward Valadao, Jr. He guaranteed debts of the Valadaos to Lender. *Which* debts he guaranteed are the subject of this dispute. Defendant contends the trial court erred in failing to consider extrinsic evidence he offered to show his guaranty extended only to the Valadaos' debts relating to Lone Star Dairy and not those incurred in their capacities as general partners of Triple V Dairy. We agree that the trial court erred. After reviewing the evidence, we conclude that the guaranty is reasonably susceptible to defendant's interpretation. The trial court therefore should have considered defendant's evidence and denied Lender's motion.

Accordingly, we reverse and remand for further proceedings in accordance with this opinion.

## BACKGROUND

Together with certain other individuals, the Valadaos were partners in Triple V Dairy, a California general partnership. In November 2012, Lender extended a line of credit to Triple V Dairy under a credit agreement, which the parties later amended

---

[1] The Valadaos share their surname with defendant and appellant Eduardo Valadao. For clarity, we refer to defendant and appellant as "defendant." Our reference to the "Valadaos" does not include defendant.

on various occasions. In December 2013, Lender extended a second line of credit to Triple V Dairy under a second credit agreement, which the parties also later amended on various occasions. The Valadaos signed each of the Triple V Dairy credit agreements in their respective capacities as "General Partner." Defendant did not execute a guaranty of Triple V Dairy's obligations to Lender in connection with either such credit agreement.

In May 2013, after the date of the first Triple V Dairy credit agreement but before the date of the second Triple V Dairy credit agreement, Lender entered into a credit agreement with the Valadaos. The credit agreement provided for a term loan and a line of credit to finance the "Lone Star Dairy." The Lone Star Dairy is not a legal entity but merely a "dba"—a name under which the Valadaos did business. The Valadaos signed the Lone Star Dairy credit agreement as "EDWARD VALADAO, JR., doing business as Lone Star Dairy" and "APRIL VALADAO, doing business as Lone Star Dairy," respectively.

Defendant executed a guaranty dated as of the same date as the Lone Star Dairy credit agreement. By the guaranty, defendant "absolutely, unconditionally and irrevocably guarantee[d] to Lender full and prompt payment . . . and full and prompt performance . . . of the Guaranteed Obligations (as defined [t]herein) . . . ."

Two defined terms in the guaranty are relevant to the dispute on appeal.

First, in recitals, the guaranty defines "Borrower" as follows: "Lender has extended or will extend credit or other financial accommodations to EDWARD VALADAO, JR. ('Edward Valadao, Jr.') and APRIL VALADAO ('April Valadao'), husband

and wife, doing business as Lone Star Dairy (Edward Valadao, Jr. and April Valadao are individually and collectively, 'Borrower'), under the terms and conditions of a credit agreement between Borrower and Lender dated as of the date of this guaranty (that agreement, the 'Credit Agreement')."

Second, the guaranty defines "Guaranteed Obligations," in relevant part, as (a) all obligations under the Lone Star Dairy credit agreement, and (b) "all other obligations of Borrower to Lender, whether now existing or hereafter incurred or created . . . ." The interpretation of the second definition lies at the heart of this dispute.

When the loans made pursuant to the Triple V Dairy credit agreements matured in 2017, Triple V Dairy failed to repay them. The loans made pursuant to the Lone Star Dairy credit agreement matured on the same day, and the Valadaos also failed to repay them. Accordingly, in November 2017, Lender sued Triple V Dairy, its six general partners (including the Valadaos), and defendant. Lender specified that it was suing the Valadaos in their individual capacities, both as general partners of Triple V Dairy and doing business as Lone Star Dairy. In Lender's initial complaint, it alleged only that the Lone Star Dairy loans were secured by defendant's guaranty, making no mention of recourse to defendant on account of the Triple V Dairy obligations.

Lender filed an amended complaint about a year later. This time it alleged defendant's guaranty extended both to the Lone Star Dairy loans and the Valadaos' obligations under the Triple V Dairy loans. The Lone Star Dairy obligations were thereafter satisfied (the parties do not tell us how) but the Triple V Dairy obligations remained outstanding. Lender obtained a

4

judgment against Triple V Dairy by stipulation—approximately $8.7 million—and then filed a summary adjudication motion against defendant on the guaranty. According to Lender's motion, the guaranty unambiguously extended to all the Valadaos' debts to Lender, including their personal liability to Lender in respect of the Triple V Dairy loans in their capacity as general partners of Triple V Dairy.

The following day, defendant filed a motion for summary judgment against Lender. According to defendant's motion, the guaranty was limited to the Valadaos' debts to Lender incurred while doing business as Lone Star Dairy, and not as general partners of Triple V Dairy. Like Lender, defendant claimed his own interpretation of the guaranty was compelled by its "unambiguous language," meaning it had to be construed without resort to extrinsic evidence.

But in opposing Lender's motion, defendant took a different tack. There, relying on authority that extrinsic evidence may be used to construe an ambiguous term, defendant proffered internal Lender records and correspondence from Lender to defendant regarding the Lone Star Dairy loans. In the internal Lender records, Lender referenced the guaranty only in connection with the Lone Star Dairy loans and made statements to the effect that the Triple V Dairy loans had "no Guarantor." Lender's correspondence to defendant concerned only the Lone Star Dairy loans, and defendant testified that he got no equivalent correspondence regarding the Triple V Dairy loans. This evidence, defendant contended, showed the guaranty's definition of "Borrower" was "reasonably susceptible" to his interpretation as limited to the Valadaos "doing business as Lone Star Dairy."

The trial court granted Lender's summary adjudication motion and denied defendant's motion. In rendering its decision, the trial court stated it "w[ould] not consider any extrinsic evidence of the parties' intent . . . ." It explained: "although [defendant] offers extrinsic evidence of the parties' intent as to the definition of 'Borrower,' such evidence should not be considered because both parties, including [defendant], contend and explicitly argue that the Guaranty is unambiguous and should be interpreted according to the contract language alone."

On the basis of the parties' dueling claims of what the "unambiguous" contract means, the trial court proceeded to construe the guaranty based on its terms alone. After parsing the structure of the sentence where "Borrower" is defined, it concluded that "any debt that [the Valadaos] owe to [Lender] is a 'Guaranteed Obligation' for which [defendant] is, in the event of nonpayment, liable." Because there was no dispute that the Valadaos had obligated themselves to satisfy Triple V Dairy's obligations to Lender and those obligations were in default and unsatisfied, the trial court entered judgment against defendant— approximately $10.1 million after accounting for interest on the Triple V Dairy judgment.

Defendant timely appealed.

## DISCUSSION

### 1. Summary Adjudication Standard of Review

A party is entitled to summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) "Summary adjudication works the same way, except it acts on specific causes of action or affirmative defenses, rather than on the entire

6

complaint." (*Hartline v. Kaiser Foundation Hospitals* (2005) 132 Cal.App.4th 458, 464.) Thus, "[w]e review rulings on motions for summary judgment and summary adjudication de novo, applying the same rules and procedures." (*Ibid.*)

A plaintiff moving for summary judgment must produce admissible evidence on each element of a cause of action entitling it to judgment. (Code Civ. Proc., § 437c, subd. (p)(1).) Once the plaintiff has met its burden, "the burden shifts to the defendant . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (*Ibid.*)

Our Supreme Court has made clear that the purpose of the 1992 and 1993 amendments to the summary judgment statute was " 'to liberalize the granting of [summary judgment] motions.' " (*Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 542.) It is no longer called a "disfavored" remedy. (*Ibid.*) "Summary judgment is now seen as 'a particularly suitable means to test the sufficiency' of the plaintiff's or defendant's case." (*Ibid.*)

2. **Analysis**

This appeal rests on a single premise: that the trial court erroneously refused to consider extrinsic evidence defendant offered to show the parties intended to limit the term "Borrower" in the guaranty to the Valadaos *doing business as Lone Star Dairy*.

a. **Applicable rules of contract interpretation**

"The interpretation of a contract is a judicial function. [Citation.] In engaging in this function, the trial court 'give[s] effect to the mutual intention of the parties as it existed' at the time the contract was executed. [Citation.] Ordinarily, the objective intent of the contracting parties is a legal question

7

determined solely by reference to the contract's terms." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125–1126 (*Walt Disney Pictures*).)

"The court generally may not consider extrinsic evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract." (*Walt Disney Pictures*, *supra*, 162 Cal.App.4th at p. 1126.) Indeed, *no* extrinsic evidence is admissible to "add to, detract from, or vary the terms of a written contract." (*Pacific Gas & Electric Co. v. G. W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 39–40 (*Pacific Gas & Electric*).) "Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous." (*Walt Disney Pictures*, at p. 1126; see also *Pacific Gas & Electric*, at pp. 39–40.)

A term is ambiguous when it is "reasonably susceptible to more than one interpretation." (*Joseph v. City of Atwater* (2022) 74 Cal.App.5th 974, 982; see also *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 525 ["contractual language is 'ambiguous only if it is susceptible to two or more reasonable constructions despite the plain meaning of its terms' " (italics omitted)].) Contract language is "reasonably susceptible" only to those meanings plausibly embraced by the words of the agreement. Contract language is *not* reasonably susceptible to a reading that contradicts the contract's express terms. (See *Consolidated World Invs., Inc. v. Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 379; see also *Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 344.)

For example, "if the contract calls for the plaintiff to deliver to defendant 100 pencils by July 21, 1992, parol evidence is not admissible to show that when the parties said 'pencils' they really

meant 'car batteries' or that when they said 'July 21, 1992' they really meant May 13, 2001." (*Consolidated World Invs., Inc. v. Lido Preferred Ltd.*, *supra*, 9 Cal.App.4th at p. 379.) In contrast, even where the meaning of a term may seem obvious on its face, it may nonetheless be ambiguous where the parties accorded it a special meaning. (*Abers v. Rounsavell* (2010) 189 Cal.App.4th 348, 356.) For example, extrinsic evidence may be considered to ascertain whether, where unresolved by the agreement, "days" means business days or calendar days, or "tons" means one or another weight sometimes referred to as a ton. (*Bionghi v. Metro. Water Dist.* (1999) 70 Cal.App.4th 1358, 1366.)

Whether a term is ambiguous is a question of law, not fact (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 (*Winet*)), but one that must be informed by the evidence offered to demonstrate the existence of the ambiguity. (*Ibid.* ["The test of whether parol evidence is admissible to construe an ambiguity is not whether the language appears to the court to be unambiguous, but whether the evidence presented is relevant to prove a meaning to which the language is 'reasonably susceptible' "]; see also *Pacific Gas & Electric*, *supra*, 69 Cal.2d at p. 37 ["The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible].")

Thus, when presented with a claim of ambiguity, the trial court must "provisionally receive[] (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity' . . . . If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the

interpretation urged, the extrinsic evidence is then admitted to aid in . . . interpreting the contract." (*Winet, supra,* 4 Cal.App.4th at p. 1165; see also *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351 (*Wolf*).) On the other hand, if the court, after reviewing the extrinsic evidence provisionally received, concludes that the language is *not* reasonably susceptible to the proponent's interpretation, it is excluded, and this ends the inquiry. (*Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 847 ["When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is 'reasonably susceptible' to the interpretation urged by the party. If it is not, the case is over"].)

It is error for a trial court to refuse to consider extrinsic evidence of an alternative meaning on the basis of the trial court's own conclusion that the language of the contract is unambiguous on its face. (*Wolf, supra,* 114 Cal.App.4th at p. 1351.)

### b. The trial court refused to consider defendant's extrinsic evidence

Lender disputes on appeal that the trial court in fact failed to "provisionally receive" defendant's extrinsic evidence about the meaning of the term "Borrower" in the guaranty. Lender's view that the court adequately considered defendant's evidence is premised on two facts. First, Lender contends in its brief the trial court identified specific extrinsic evidence in its order—"the Cowlifornia Dairy[2] loan documents and the signature blocks on the other Lone Star loan agreements." Second, it justified

---

[2] Cowlifornia Dairy is apparently another entity or "DBA" related to defendant and/or the Valadaos that took a loan from Lender which defendant guaranteed.

10

"[e]xclusion" of the evidence by *Pacific State Bank v. Greene* (2003) 110 Cal.App.4th 375 (*Pacific State Bank*), in which the court detailed extrinsic evidence a guarantor offered to interpret her guaranty but deemed it inadmissible because the guarantor's construction was at odds with any reading of the contract's terms. From this, Lender would have us infer that the trial court performed the same analysis as the *Pacific State Bank* court notwithstanding the court's express statements to the contrary.

Specifically, the trial court's order states: "The court will not consider any extrinsic evidence of the parties' intent, such as the loan regarding Cowlifornia Dairy." It continues, "extrinsic evidence of the parties' intent as to the definition of 'Borrower[]' . . . should not be considered because both parties . . . contend and explicitly argue that the Guaranty is unambiguous and should be interpreted according to the contract language alone."

Lender contends the trial court considered evidence extrinsic to the guaranty when the court referred to "other Lone Star loan agreements." But the credit agreement, which included a term loan and a line of credit to finance Lone Star Dairy, and the guaranty are inseparable parts of the same transaction. They were executed on the same date in connection with the same credit; the guaranty was a condition precedent to the extension of credit; the guaranty incorporates portions of the credit agreement (e.g., definitions and rules of interpretation) by reference; and the credit agreement's integration clause includes the guaranty. As such, the credit agreement was not extrinsic to the guaranty. (See *Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1320 [" ' "It is a general rule that several papers relating to the same subject-matter and executed as parts of substantially one transaction, are to be construed together as one contract" ' "].)

11

In any event, the trial court's description of extrinsic evidence in its order does not mean that it provisionally received it and considered whether such evidence rendered the term "Borrower" ambiguous. We take the trial court's statement that it did not "consider" evidence at face value. It is one thing to recognize that extrinsic evidence has been offered; it is quite another to assess its significance and disregard it based on its substance. The trial court here only did the former. Its discussion of *Pacific State Bank* does not change this. In fact, it confirms it.

As the trial court noted in its order, the *Pacific State Bank* court excluded extrinsic evidence because it was offered to "confer[] upon the guaranty a meaning to which it was not 'reasonably susceptible.' " (See *Pacific State Bank*, *supra*, 110 Cal.App.4th at pp. 386–387.) But the Court of Appeal did so only after considering the full substance of the extrinsic evidence. Indeed, that evidence—declaration testimony that the obligee's agent orally limited the guaranty—was reproduced at length in the *Pacific State Bank* opinion. (See *id*. at p. 382.) In concluding that defendant's extrinsic evidence was offered to support a similarly unreasonable construction, the trial court here addressed only defendant's arguments based on the text of the guaranty. In doing so, it skipped to the conclusion of no ambiguity without considering defendant's proffered evidence— just as the court stated in its order.

### c. The trial court's refusal to consider defendant's extrinsic evidence was error

#### i. Lender's argument for a limited review lacks merit

We again pause to address a preliminary issue Lender raises by another strained reading of the trial court's order. According to Lender, the court made a "factual finding, upon which it partially premised its legal conclusions, that [defendant] and [Lender] agreed that the [g]uaranty is not ambiguous." This "fact," Lender continues, is subject only to substantial evidence review. We reject this argument.

The trial court did not find an "agreement" between the parties; it merely observed that Lender and defendant had both argued the guaranty's language was unambiguous. Defendant made this argument in his own motion for summary judgment, which the trial court denied. But there was no agreement or stipulation between the parties that the guaranty is not ambiguous. In simultaneously opposing Lender's motion for summary adjudication, defendant argued otherwise. Specifically, he presented the court with argument and authority that it was obligated to consider his extrinsic evidence because the guaranty's language was "reasonably susceptible" to his interpretation. Put another way, he argued that, if the court did not find the guaranty unambiguously supported his interpretation that the definition of "Borrower" limited it to the debts of Lone Star Dairy, then the term "Borrower" was at least ambiguous.

13

### ii. The trial court should have considered defendant's extrinsic evidence

The trial court cited just one authority, *Allen v. Smith* (2002) 94 Cal.App.4th 1270, in support of its decision to ignore defendant's extrinsic evidence. In that case, the court noted in passing that "[p]arol evidence may be admitted to construe ambiguous contract terms," but considered no extrinsic evidence because "the parties agree[d] the contract [wa]s unambiguous and contain[ed] their entire agreement." (*Id*. at p. 1277.) *Allen* is easily distinguishable on its facts. Unlike here, there is no indication in *Allen* that either party offered extrinsic evidence to support their respective interpretations of the agreement or argued in the alternative that the contract was ambiguous.

On appeal, Lender cites just one other decision, *Fiteq Inc. v. Venture Corp*. (N.D.Cal. June 30, 2015, No. 13-cv-01946-BLF) 2015 U.S.Dist. Lexis 85110, to justify ignoring extrinsic evidence when both sides argued by cross-motion that the subject contract was unambiguous. That case has no persuasive value here. First, it is an unpublished decision of a federal court. Second, there was an express agreement in briefing that the court should not look to extrinsic evidence. The defendants stated in their brief: " 'Defendants agree with [plaintiff] that the [agreement] is unambiguous and should be interpreted without resorting to parol evidence.' " (*Id*. at p.*11.) Third, although a footnote indicates the defendants may have alternatively argued an ambiguity existed—it says they argued "the parol evidence produced by Plaintiff creates a dispute of material fact that precludes summary judgment" (*id*. at p. *11, fn. 1)—the court did not address California law requiring provisional receipt of extrinsic evidence to resolve a claim of ambiguity.

14

Just as Lender cites no persuasive authority that the trial court was entitled to ignore evidence offered in opposition to Lender's motion based on defendant's unsuccessful legal position in his own motion, defendant cites nothing directly on point to show error. Defendant offers that "[t]here is nothing perplexing or inconsistent about a party arguing it believes contractual language is clear and unambiguous but, to the extent the court disagrees, showing the court through extrinsic evidence that its interpretation is correct." We agree. Further, we agree that unsuccessfully making one argument by motion does not preclude making another in opposition to a cross-motion.

As defendant observes, cross-motions for summary judgment must be determined independently of one another. (*Tahoe Reg'l Planning Agency v. King* (1991) 233 Cal.App.3d 1365, 1375, fn. 1.) This means the trial court had an obligation to consider whether Lender met its burden to show it was entitled to judgment as a matter of law in light of defendant's opposition and not based on legal positions defendant took in his motion. The proper consequence of defendant moving on the untenable position that the guaranty was unambiguously limited to debts the Valadaos incurred while doing business as Lone Star Dairy was to deny defendant's motion, not to limit his ability to oppose Lender's motion. Indeed, if legal positions in a motion restricted those available in opposition to a cross-motion, cross-motions for summary judgment would always result in a judgment because each party has necessarily taken the position that there are no triable issues of material fact. This is not the law. (*Borges v. Home Ins. Co.* (1966) 239 Cal.App.2d 275, 276 ["We have been cited to no case and know of none which permits a reviewing court to treat two contesting motions for a summary judgment as

15

a submission of the case to the court for a judgment on the record"].)

For these same reasons, we reject Lender's argument that defendant invited error in the resolution of Lender's motion based on a position he took in his own motion. We also reject Lender's argument that defendant was judicially estopped from opposing Lender's summary adjudication motion by arguing ambiguity (i.e., the guaranty was *reasonably susceptible to his interpretation*) because in his cross-motion he claimed his interpretation was *the only reasonable one*. Judicial estoppel ordinarily applies only when all five elements are met, and Lender cannot show the third element, that the party against whom estoppel is asserted "was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true)." (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 183.) The trial court here did not adopt defendant's position that the guaranty was unambiguously limited to the debts of Lone Star Dairy. While some courts have excused the success element in cases of "egregious misconduct," to the extent these cases remain good law at all (see *The Swahn Group, Inc. v. Segal* (2010) 183 Cal.App.4th 831, 849–850 [casting doubt on validity of exception]), they are inapplicable here. Defendant's positions in seeking summary judgment and opposing summary adjudication are familiar summary judgment advocacy and in no way showed him to be playing "fast and loose" with the court. (See *id*. at p. 841.)

### d.    The trial court's error was not harmless

Lender argues that any error by the trial court was harmless because defendant's proffered extrinsic evidence was inadmissible, both procedurally and substantively, and

16

inconsequential in any event. As to procedural inadmissibility, Lender contends "none" of defendant's extrinsic evidence was competent under the Evidence Code. As to substantive inadmissibility, it argues that, if the trial court had considered the evidence, it would not have affected the outcome. We reject both arguments.

### i. Some of defendant's extrinsic evidence was procedurally admissible

First, we note that Lender's procedural objections to defendant's evidence do not address that when Lender filed its initial complaint, it alleged that "[t]he Lone Star [Dairy loans] are also secured by [the guaranty]" but made no corresponding allegation that defendant also guaranteed the Triple V Dairy loans. Though it was not included in defendant's separate statement in opposition, defendant relied on this fact by reference to Lender's filed complaints in his opposition and Lender made no objection, even as it acknowledged the argument.

Defendant included the initial and operative complaints in the record on appeal and continues to rely on the differences between the two in his appellate briefs. Like in the trial court, Lender made no procedural objection to the evidence in its responding brief on appeal. Rather, Lender addressed the differences between the complaints and elaborated on the issue, even filing the leave to amend papers (including a comparison document showing changes between the initial complaint and the operative complaint) in a separate appendix.

Trial courts have discretion under Code of Civil Procedure section 437c, subdivision (b)(3) to consider evidence missing from the separate statement that is part of the record. (*San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308,

17

316 ["Whether to consider evidence not referenced in the . . . separate statement rests with the sound discretion of the trial court"].) The initial complaint was part of the summary judgment record, even in the absence of a request for judicial notice. (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2022) ¶ 9:53.1a ["It is not necessary to ask the court to take judicial notice of materials previously filed in the case; all that is necessary is to call the court's attention to such papers"].)

Ordinarily, we would view the trial court's disregard of the differences between the initial complaint and amended complaint as an exercise of its discretion. (*San Diego Watercrafts, Inc. v. Wells Fargo Bank*, *supra*, 102 Cal.App.4th at p. 316.) But the trial court plainly did not exercise any such discretion in this case—it flatly refused to consider any extrinsic evidence on the mistaken belief that defendant's legal position in his motion for summary judgment precluded consideration of any extrinsic evidence. Given our obligation to independently determine Lender's motion and the parties' respective arguments requiring us to consider the evidence in the first instance, we consider our discretion to consider the differences between Lender's two complaints coextensive to that of the trial court's in this regard. In light of the established significance of prior pleadings in summary judgment proceedings (see, e.g., *St. Paul Mercury Ins. Co. v. Frontier Pacific Ins. Co.* (2003) 111 Cal.App.4th 1234, 1248 [judicial admissions in pleadings binding on summary judgment]) and each party's inclusion of related facts in their respective appellate records, we exercise our discretion to do so.

As to the correspondence defendant included in opposition to Lender's motion, Lender contends it was inadmissible because

defendant could not authenticate it. Specifically, Lender observes that defendant's declaration stating he received the correspondence contradicted an earlier discovery response he gave denying receipt. We need not consider this argument because Lender authenticated much of the same evidence itself.

Attached to Lender's operative complaint were eight letters from Lender to the Valadaos concerning amendments to the Lone Star Dairy loans. Each of these letters contained defendant's name in the "cc" line after the signature. In the body of the complaint, Lender admitted that these letters were "true and correct" copies of the originals. " 'The admission of fact in a pleading is a "judicial admission." ' . . . '[T]he trial court may not ignore a judicial admission in a pleading, but must conclusively deem it true as against the pleader.' " (*Bucur v. Ahmad* (2016) 244 Cal.App.4th 175, 187, citations omitted.) Lender's admission that these letters were "true and correct" copies and act of attaching them to the complaint are sufficient to establish their authenticity. (See Evid. Code, § 1414 ["writing may be authenticated by evidence that: [¶] (a) The party against whom it is offered has at any time admitted its authenticity; or [¶] (b) The writing has been acted upon as authentic by the party against whom it is offered."].)

Defendant also submitted with his opposition other correspondence (past due notices) he attests he received from Lender concerning the Lone Star Dairy loans but which were not attached to Lender's complaint. We decline to address Lender's objection as to these notices and simply disregard them in our analysis. The eight letters Lender authenticated itself establish defendant's point: Lender sent "notice after notice" to defendant about the Lone Star Dairy loans. In contrast, it is undisputed

19

that defendant never received any notices about Triple V Dairy loans, modifications, or defaults.

As to the internal memoranda, Lender is correct that its admission that these documents were "genuine cop[ies]" is not enough to render them admissible. Lender remained entitled to, and did, object to admission of the memoranda on hearsay grounds. Defendant offers two arguments in response. We need not address whether the memoranda are admissible under the hearsay exception of Evidence Code section 1220, as we find persuasive defendant's other argument that the memoranda were not offered for a hearsay purpose.

In pertinent part, the memoranda include statements by Lender representatives to the effect that there is no guarantor of the Triple V Dairy loans. Defendant contends he did not offer the memoranda to prove the truth of the statement that there was no guarantor for the Triple V Dairy loans. Rather, he contends they are admissible to show the state of mind of Lender representatives concerned with collecting the Triple V Dairy loans. The Lender representatives' belief there was no guarantor of the Triple V Dairy loans supports the inference that they did not believe, at the time the memoranda were written, that defendant had guaranteed those loans. That would explain why the Lender sent many letters to defendant demanding he satisfy only the Lone Star Dairy guaranty, and why the original complaint alleged defendant guaranteed the Lone Star Dairy debt but not the Triple V Dairy debt—which would, in turn, support an inference that it was litigation counsel who advised the Lender to amend the complaint to allege defendant had guaranteed the Triple V Dairy debt, based on legal arguments

20

rather than the negotiations of the Lender representatives with defendant.

> ### ii. The extrinsic evidence was substantively admissible

Lender's argument that the evidence is substantively inadmissible fails. It is premised on the rule that parol evidence cannot be admitted in support of an interpretation to which the contract language is not reasonably susceptible. Lender's argument effectively asks us to commit the same error that the trial court did—to look just to the words of the guaranty to determine that it is unambiguous and therefore no evidence could have been provisionally admitted to construe it. This puts the cart before the horse. In order to determine that extrinsic evidence is inadmissible under the parol evidence rule, the court must first consider the substance of the evidence:

"Although extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract, these terms must first be determined before it can be decided whether or not extrinsic evidence is being offered for a prohibited purpose. The fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms. That possibility is not limited to contracts whose terms have acquired a particular meaning by trade usage, but exists whenever the parties' understanding of the words used may have differed from the judge's understanding. [¶] Accordingly, rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties." (*Pacific Gas & Electric, supra*, 69 Cal.2d at pp. 39–40, fn. omitted.)

We thus proceed to consider the evidence.

21

### iii. The trial court's failure to consider defendant's evidence caused it to enter judgment in error

The trial court's failure to consider defendant's evidence caused it to erroneously conclude that the definitions of "Edward Valadao, Jr." and "April Valadao," and in turn "Borrower," could only mean what the trial court thought they did from reading the guaranty. Had the trial court considered defendant's other evidence, it would have recognized the parties may have intended the meaning that defendant urges.

Defendant executed the guaranty the same day the Valadaos executed the Lone Star Dairy credit agreement. He did so "[t]o induce Lender to extend credit to [the Valadaos]." Before the guaranty and Lone Star Dairy credit agreement were executed, the Valadaos had already obligated themselves to Lender in their capacities as general partners of Triple V Dairy, which had borrowed money from Lender several months earlier. The guaranty made specific reference only to the Lone Star Dairy loans but made no reference to the Triple V Dairy loans.

In July 2013, August 2014, September 2015, March 2016, and November 2016, the Valadaos and Lender amended the Lone Star Dairy credit agreement. As to each amendment, defendant signed the acknowledgement and consent form as guarantor. In May 2014, August 2015, August 2016, and October 2016, the Valadaos and Lender agreed to extend the maturity of the Lone Star Dairy loans. Every document extending the Lone Star Dairy loans identifies defendant as a "cc" recipient of such document.

In December 2013, September 2014, September 2015, and February 2017, Triple V Dairy and Lender amended the Triple V Dairy credit agreement. In August 2015, August 2016, October

22

2016, and November 2016, Triple V Dairy and Lender agreed to extend the maturity of the Triple V Dairy loans. Lender gave defendant *no* notice of these amendments or extensions, even though three of the extensions were given within a day or less of extensions of the Lone Star Dairy loans that resulted in notices to defendant.

Between 2014 and 2017, Lender representatives administering the loans identified defendant as a guarantor of the Lone Star Dairy loans but not as a guarantor of the Triple V Dairy loans. Lender's internal reports list "***Secondary Source(s) of Repayment***" of Triple V Dairy's obligations, not just guarantors, and they do not list defendant—whom Lender now seeks to hold secondarily liable on a judgment against Triple V Dairy.

Lender refused to provide further extensions of the Triple V Dairy loans in September 2017, they matured at the end of that month, and "Triple V [Dairy] and its partners," including the Valadaos, defaulted by failing to pay the balance of the loans when due. Similarly, Lender refused to provide further extensions of the Lone Star Dairy loans in September 2017, they matured at the end of that month, and the Valadaos defaulted by failing to pay the balance of the loans when due.

Lender sought to enforce the parallel defaults under the Lone Star Dairy credit agreement and the Triple V Dairy credit agreement in largely the same way but with one glaring difference. In an omnibus complaint to collect on, among others, the Triple V Dairy loans and the Lone Star Dairy loans, Lender sued the Valadaos, naming them in the caption as "EDWARD VALADAO, JR., individually, as a general partner in TRIPLE V DAIRY and dba LONE STAR DAIRY [and] APRIL VALADAO,

23

individually, as a general partner in TRIPLE V DAIRY and dba LONE STAR DAIRY." In the same complaint lender also sued defendant, "EDUARDO VALADAO, an individual." But when it alleged the extent of defendant's liability under the guaranty, it alleged only that he guaranteed the Lone Star Dairy loans, without mention of the Triple V Dairy loans.

"[T]he practical construction placed upon a contract by the parties before any controversy arises regarding meaning affords one of the most reliable means of determining the intent of the parties." (*United California Bank v. Maltzman* (1974) 44 Cal.App.3d 41, 49; see also *Kennecott Corp. v. Union Oil Co.* (1987) 196 Cal.App.3d 1179, 1189; *Salton Bay Marina, Inc. v. Imperial Irrigation Dist*. (1985) 172 Cal.App.3d 914, 936.) The controversy regarding the scope of the guaranty arose well after Lender filed the initial complaint. Though the precise date does not matter, Lender offers guidance by including in its appendix a July 2018 e-mail between counsel concerning the "previously unstated [Lender] contention that [defendant] ha[d] allegedly guaranteed . . . the Triple V [Dairy] obligation . . . ."

Lender's noticing, internal records, and enforcement conduct tend to show that, before their dispute, the parties understood the guaranty to be limited to obligations the Valadaos incurred while doing business as Lone Star Dairy. If Lender believed defendant also guaranteed the Valadaos' obligations in respect of the Triple V Dairy loans, why would it have provided defendant notices about the Lone Star Dairy loans but not the Triple V Dairy loans? Especially when it was sending notices regarding the two sets of loans at the same time? And why would Lender representatives have identified defendant as a secondary

24

source of repayment of the Lone Star Dairy loans but not the Triple V Dairy loans?

Similar questions arise regarding the initial complaint and changes in the amendment, leading to a similar inference that Lender did not think defendant guaranteed the Triple V Dairy obligations until after it filed its lawsuit. When seeking to collect on all of the loans together, why would Lender allege defendant's liability with respect to the Valadaos' Lone Star Dairy obligations only while omitting any mention of the Triple V Dairy obligations? The amendments to the initial complaint suggest that Lender, in the midst of litigation, formed a new understanding of the guaranty that it had not previously held. For the first time in the amended complaint, Lender alleged that it was "informed and believe[d] that [defendant] guaranteed the obligations of the [Valadaos] to [Lender]."

In view of evidence that the parties may have intended the defined terms for the Valadaos and "Borrower" in the guaranty to be limited to the Valadaos doing business as Lone Star Dairy, we must ask whether this is an interpretation to which the guaranty is reasonably susceptible. We are satisfied that it is.

It is certainly reasonable to interpret the terms "Edward Valadao, Jr." and "April Valadao" as the trial court did—only by reference to the individuals named before the definitions. But in light of defendant's extrinsic evidence, we see the terms are also reasonably susceptible to being interpreted as modified by the descriptors applied to the Valadaos in the sentence's subsequent clause—"husband and wife, doing business as Lone Star Dairy." Importantly, Lender offers no authority, and we are aware of none, that a term defined in a contract may be defined only by

what precedes it in the definitional clause or sentence, and not by what comes after.

To understand the definitions of "Edwardo Valadao, Jr." and "April Valadao" to embrace the description of the Valadaos as "husband and wife, doing business as Lone Star Dairy" does not result in a contradiction in terms or require that the contract be rewritten. Lender argues that reading "husband and wife" into the definitions of "Edwardo Valadao, Jr." and "April Valadao" would result in the absurdity of conditioning the guaranty's scope on the Valadaos' marital status. We disagree. By providing that "Borrower" includes the Valadaos "individually and collectively," any restriction based on their marital status falls away—they could not "individually" be "husband and wife." But the Valadaos *could* conceivably operate Lone Star Dairy together or independent of one another. Accordingly, it is a reasonable construction of the entire definitional sentence that each Valadao, when doing business as Lone Star Dairy, either together or separately, is a "Borrower."

For these reasons, we conclude that the term "Borrower" is ambiguous and extrinsic evidence is admissible to resolve its meaning.

### e. We will not enter judgment for defendant based on his extrinsic evidence alone

"When two equally plausible interpretations of the language of a contract may be made, . . . parol evidence is admissible to aid in interpreting the agreement, thereby presenting a question of fact which precludes summary judgment if the evidence is contradictory." (*Walter E. Heller Western, Inc. v. Tecrim Corp.* (1987) 196 Cal.App.3d 149, 158.) Defendant asks that we resolve the ambiguity in his favor based on the absence of

26

any conflict in the evidence—an absence attributable to Lender's failure to introduce any extrinsic evidence of its own. We decline to do so. Having found the extrinsic evidence demonstrates at least two plausible interpretations of the credit agreement and guaranty, we have concluded there is a triable issue of fact which precludes summary judgment on this record.

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court with instructions to deny Lender's motion for summary adjudication. Defendant is to recover his costs on appeal.

GRIMES, J.

WE CONCUR:

STRATTON, P. J.

VIRAMONTES, J.